# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| CHAMPS SPORTS BAR & GRILL CO. and FASHIONADVICE.COM, LLC D/B/A SAM MALOUF, individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiffs, | Complaint – Class Action |
| v. | |
| MERCURY PAYMENT SYSTEMS, LLC, | |
| Defendant. | |

Plaintiffs Champs Sports Bar & Grill Co. ("Champs") and FASHIONADVICE.COM, LLC d/b/a Sam Malouf ("Sam Malouf") (together, "Plaintiffs," unless otherwise identified), individually and on behalf of all others similarly situated (the "Class," as defined below), complain and allege as follows based on personal knowledge as to themselves and on information and belief as to all other matters, against Defendant Mercury Payment Systems, LLC ("Mercury or "Defendant"):

## NATURE OF THE ACTION

1.     Plaintiffs, individually and on behalf of all others similarly situated, bring this action against Mercury, a nationally-operating merchant acquirer and

payment card processor, for its use of unfair, unlawful, and fraudulent business practices in violation of Georgia state law.

2.    For years, Mercury has carried out a widespread and systematic fraud on its client base of small and medium-sized merchants.   Without notice to merchants, Mercury has been surreptitiously and gradually inflating certain fees imposed by the VISA and MasterCard card associations, over which Mercury has no lawful control and which merchants expect to pay at cost, reaping tens or hundreds of millions of dollars in ill-gotten gains.

3.    The card association fees at issue are of two kinds: access fees, called network access and brand usage ("NABU") fees by MasterCard and acquirer processing fees ("APF") by VISA, and interchange fees.

4.    The access fees – also sometimes referred to as "dues and assessments" in the payment card industry – are established and published by the MasterCard and VISA card associations at $0.0195, or 1.95¢, per transaction processed.   These fees are paid by merchants and collected by payment card processors like Mercury, and distributed to the card associations.   No entity aside from the card associations themselves has the authority to increase or decrease these fees.

5.      The interchange fees are also established and published by the MasterCard and VISA card associations, but are distributed to card issuing banks or financial institutions instead of the card associations.

6.      Interchange rates vary by card type.  For instance, a credit card has a slightly higher interchange rate than a debit card, and a credit card with a rewards program has a slightly higher interchange rate than a credit card without such a program.  However, all interchange rates are standardized, such that all merchant acquirers and processors, like Mercury, must collect these fees at the same rates. No merchant acquirer or processor has the authority to increase or decrease these rates.

7.      During the Class Period, Mercury has inflated both access fees and interchange fees without notifying Plaintiffs and the other Class members that it had done so.  The amount of inflation added to access fees by Mercury ranges from 1¢ per transaction to as much as 4¢ per transaction.  The amount of inflation added to interchange rates varies by card type but amounts to hundreds or thousands of dollars in overcharges, depending on card type.  Cumulatively, this unauthorized inflation has deprived each Plaintiff of thousands of dollars.

8.      In addition to inflating access fees and interchange fees, Mercury imposes unwarranted junk fees that no Plaintiff agreed to pay.  Using deceptive

language, Mercury describes these fees as having been required by third parties, when, in fact, Mercury alone is responsible for their existence and Mercury alone retains the revenues generated by them.  These fees include monthly maintenance fees, regulatory compliance fees, and "PCI" fees, the latter of which are purportedly required to ensure merchants' compliance with privacy and fraud-prevention standards.  These fees amount to at least $40 per month per merchant, resulting in massive windfall gains for Mercury.

9.    Each Plaintiff is a former client of Mercury and was overcharged for both access fees and interchange fees, and required to pay additional junk fees. Invoices provided by Mercury to the Plaintiffs – several of which are attached as exhibits to this complaint  – demonstrate unequivocally that Mercury charged them inflated access and interchange fees and various junk fees.

10.    In particular, the invoices show that Mercury has arbitrarily imposed different levels of inflation on different merchants, as some Plaintiffs (such as Sam Malouf) were charged NABU and APF fees of $0.0295, or 2.95¢, per transaction, while others (such as Champs) were charged as much as $0.0595, or 5.95¢, per transaction.  Each Plaintiff was also required to pay a monthly maintenance fee ranging from $15.95 to $25.95, and a $24.95 PCI fee, among other unwarranted and unauthorized junk fees.

11.     Even an overcharge of 1¢ per transaction has a substantial impact on a merchant's revenues.  The Class members are small and medium-sized businesses that may process hundreds or thousands of small-value transactions each month. Their retail prices may reflect the cost of payment card processing services, but not the added cost of artificially inflated fees or junk fees.  The amount by which Mercury has overcharged them constitutes a pure loss not offset by merchants' pricing decisions.

12.     Moreover, due to the insidious and well-concealed nature of the fraud, most merchants are unaware that Mercury has been quietly extracting from them amounts to which it is not entitled under the guise that it is simply passing along standard card association fees and required compliance or maintenance fees.

13.     As alleged in detail below, Mercury has deceptively, inequitably, unlawfully, and fraudulently overcharged Plaintiffs and the other members of the Class solely in order to maximize its own revenues at the expense of its clients. Plaintiffs, individually and on behalf of the other Class members, assert causes of action for common law fraud and unjust enrichment, seeking return of all monies fraudulently and/or unjustly obtained by Mercury, with interest, as well as punitive damages, declaratory relief, injunctive relief, and attorneys' fees and costs of suit.

## JURISDICTION AND VENUE

14.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 Class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.  As a limited liability company, Defendant is considered an "unincorporated association" for purposes of jurisdiction under the Class Action Fairness Act.   28 U.S.C. § 1332(d)(10).

15.     This Court has personal jurisdiction over Defendant because Defendant conducts substantial business within this state, such that Defendant has significant, continuous, and pervasive contacts with the State of Georgia.

16.     Venue lies within this judicial district under 28 U.S.C. § 1391 because Defendant conducts business in this district, and a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this district. Moreover, the Card Services Agreement (Exhibit A) specifies this Court as the proper forum for any litigation arising out of or relating to that document or the relationships it creates.  Venue is also proper in the Atlanta division as Mercury is a resident of this division.

## **PARTIES**

*Plaintiffs*

17.     Champs Sports Bar & Grill Co., operating as TJ's on the Avenue, operates a restaurant in Mentor, Ohio.  Champs is organized under the laws of the State of Ohio and maintains its principal place of business in the State of Ohio. From at least August 2012 through March 2015, Champs obtained payment card processing services from Mercury.  Champs is a privately held company.

18.     FASHIONADVICE.COM, LLC d/b/a Sam Malouf operates a retail clothing store in Burlingame, California.  Sam Malouf is organized under the laws of the State of California and maintains its principal place of business in the State of California.    From at least October 2010 through May 2015, Sam Malouf obtained payment card processing services from Mercury.   Sam Malouf is a privately held company.

*Defendant*

19.     Mercury Payment Systems, LLC is a privately-held registered merchant services provider headquartered in Durango, Colorado and organized under the laws of the State of Delaware.  Mercury is wholly owned by Vantiv, Inc., a publicly-traded technology company headquartered in Cincinnati, Ohio.

Mercury processes over $25 billion per year in electronic transactions for approximately 100,000 merchant clients located in all fifty states.  Mercury has annual revenues of over $300 million.  Mercury is one of the world's largest merchant services providers, as measured by volume of transactions processed.  Mercury is subject to the jurisdiction of this Court, registered to do business in Georgia, and may be served with process through its registered agent, Corporation Services Company, 40 Technology Parkway, South, #300, Norcross, Georgia, 30092.

## FACTUAL ALLEGATIONS

### A.  *Mercury is a Payment Processor*

20.    Mercury's primary business is merchant acquisition and electronic payment processing.

21.    Mercury's clients are merchants seeking the ability to accept credit and debit card payments from their customers.

22.    Mercury provides its services to merchants in conjunction with a back-end credit card processing company called Global Payments Direct, Inc. ("Global") and/or its own in-house back-end processing facility.

23.    Mercury facilitates the processing of credit and debit card payments through either Global or its own in-house back-end systems, and offers its own in-house account management and merchant support services.

24.    In the payment processing industry, Mercury is known as an "independent sales organization," or "ISO."  An ISO is an organization that is not a credit card association member (*i.e.*, not a VISA or MasterCard member bank) but has a bank card relationship with one or more credit card association members. ISOs can perform a number of functions, including but not limited to processing payment cards using credit card association networks.  Mercury is a registered ISO of Wells Fargo Bank, N.A. and Fifth Third Bank.

25.    Mercury, like all card payment processors, provides services to merchants to ensure that transactions are properly credited to the merchant and charged to the customer through the bank or other financial institution that issued the customer's credit or debit card.

26.    Each time a customer's credit or debit card is used to make a payment (*e.g.*, swiped through a point-of-sale terminal at a retail store, restaurant, or other place of business, or entered into an online payment form), information is collected for transmission through the payment processing system operated by the card payment processor, so that the merchant can receive the proceeds of the

9

transaction; the issuing bank or financial institution and the card networks (such as VISA, MasterCard, and Discover Card) can receive their fees; and the customer's account can be correctly charged.

27.     Mercury, as a payment processor, is an intermediary between these parties (*i.e.*, merchants such as Plaintiffs and the other Class members, card issuing banks or financial institutions, and card networks such as VISA and MasterCard) as well as its back-end payment processing partner, Global.   Mercury is responsible for ensuring the fees owed to it and any relevant third parties, including the card issuing banks and card networks, are properly allocated.

28.     Mercury earns its revenues primarily through per-transaction fees. For every card transaction it processes, Mercury is entitled to a fixed per-transaction fee plus a small percentage of the transaction amount, which percentage has been previously disclosed to the merchants on behalf of which Mercury processes payments in the relevant Merchant Application Fee Schedule. These charges are negotiated by Mercury and each of its merchant clients.   They are ***not*** the subject of this litigation.

29.     In addition to Mercury's legitimate processing fees, merchants are required to pay two additional kinds of fees on a per-transaction basis: (i) interchange fees owed to the card-issuing bank or financial institution and (ii) card

association access fees owed to the relevant card association (i.e., MasterCard's NABU fee for each MasterCard transaction and VISA's APF fee for each VISA transaction), sometimes referred to as "dues" and/or "assessments."

30.     Interchange fees are generally calculated as a fixed per-transaction fee (e.g., $0.10 per transaction) plus a small percentage of each transaction (e.g., 1.65% of the amount of the transaction).  The fee varies based on the type of card used.  For example, a merchant will be charged a rate for transactions involving a bonus or rewards card that is higher than the rate for a card with no rewards program.  Although these fees are paid to the card-issuing bank or financial institution, the rates are uniform (based on card type) and have been established and published by the card associations, such as MasterCard and VISA.

31.     Like interchange fees, card association access fees are established and published by the card associations, such as MasterCard and VISA, but these fees are paid to the card associations.  VISA charges an APF fee (acquirer processing fee) and MasterCard charges a NABU fee (network access and brand usage).  These fees are set at $0.0195, or 1.95¢, per transaction.  The card associations impose additional fees for specific events, such as declined card transactions.

32.     Because interchange fees and card association access fees are established by the card associations, they are standardized charges that apply

11

indiscriminately to each payment processor, and are outside the control of any such processor.

33.     Moreover, because interchange fees and card association access fees are imposed on every card transaction, merchant acquirers and processors, like Mercury, pass these costs on to merchants.  A single credit card transaction with a customer using, for instance, a Chase VISA credit card will result in the merchant paying its processor (1) an interchange fee charged by the issuing bank, Chase, (2) a card association access fee charged by VISA, and (3) a fee charged by the processor.  The first two charges are unavoidable, non-negotiable fees for all merchants and are set at published rates.  The third fee is negotiable between processors and merchants and is typically established at the origination of a business relationship between a processor and a merchant.

34.     Mercury has throughout the Class Period deceptively, fraudulently, unlawfully, and unfairly inflated both the card association access fees charged by the card associations and the interchange fees charged by the card-issuing banks or financial institutions, to the detriment of merchants, including Plaintiffs and the other Class members.

35.     Plaintiffs and the other Class members are merchants that submitted Merchant Applications to Mercury for the purpose of acquiring the ability to

accept credit and debit card payments from their customers.  Plaintiffs attach to this complaint as Exhibit A a copy of the Merchant Application form distributed by Mercury.  Page 2 of this exhibit contains Mercury's Fee Schedule.  All Plaintiffs submitted a Merchant Application to Mercury in substantially the form represented by Exhibit A.

**B.**   ***Mercury Markets its Payment Processing Services Using Pricing Models That Require Card Association Access Fees and Interchange Fees to be Passed Through at Cost, but Impermissibly Inflates Those Fees***

36.    Under any pricing model, a payment processor is required to pass card association access fees (that is, NABU and APF fees) and interchange fees through to merchants at cost.  No processor has the authority or lawful ability to increase or decrease these fees, which are set by MasterCard and VISA, and are published by MasterCard and VISA.

37.    The predominant pricing model used by payment processors, including Mercury, that serve small and mid-size consumer-oriented merchants is commonly referred to as an "interchange-plus" (or "cost-plus") model.  This pricing model consists of interchange fees merchants pay to card issuing banks or financial institutions and card association access fees merchants pay to card associations, *plus* processing fees paid by merchants to the merchant acquirer or processor.  Under this model, the interchange fees and card association access fees

are passed through to merchants at cost and are itemized in each monthly invoice or statement submitted by the acquirer or processor. The acquirer or processor earns revenue in the form of processing fees, which are composed of a fixed per-transaction fee plus a small percentage of each transaction's value, as negotiated between the processor and the merchant. Processing fees represent the "plus" component of "interchange-plus" (or "cost-plus") pricing.

38. Other pricing structures utilized in the payment processing industry include tiered-rate pricing and flat-rate pricing. Unlike interchange-plus pricing, tiered-rate pricing models formulate charges in tiers or categories. Flat-rate pricing further concentrates merchant charges into a single uniform rate. However, all three pricing structures incorporate interchange fees, card association access fees, and a processing fee. The primary difference between interchange-plus and tiered-rate or flat-rate pricing models is that, in the former, merchants are made aware of the component parts of the charges imposed by the card issuing banks or financial institutions, the card associations, and the processor. Because interchange-plus pricing provides merchants the most transparency into the costs of payment card processing, merchants have demanded it from nearly all acquirers and processors, and it has become the industry standard pricing model.

14

39.     Interchange-plus (or cost-plus) pricing is a term of art in the payment card processing industry that is understood to mean that the acquirer or processor will pass through, at cost, the unavoidable third-party charges (interchange fees and card association access fees), and will add a separate processing fee representing the amount the processor is paid for its services, which is negotiated separately and disclosed to merchants prior to obtaining card processing services.

40.     Mercury began offering interchange-plus pricing in or around 2008. Today, most of Mercury's clients are charged according to an interchange-plus pricing model.   All Plaintiffs were charged according to an interchange-plus pricing model while they received payment processing services from Mercury.

41.     In its Merchant Application, Mercury represents to merchants that it will pass interchange fees and card association access fees through at cost, charging a separate processing fee (or "margin") that represents its fee.   The Merchant Application expressly states that, "Transactions will be priced based on ***actual interchange rates and assessments published by VISA, MasterCard and Discover*** plus the margin quoted in the above fee schedule."  *See* Exhibit A at 2.

42.     Merchants, including Plaintiffs and the other Class members, reasonably understood and understand this language to mean that Mercury would charge them on an interchange-plus pricing basis – that is, that Mercury's portion

of the charges would be reflected in the "margin quoted in the above fee schedule" (which is subject to negotiation between Mercury and merchants), but that actual interchange fees and card association access fees (or assessments) would be passed through at cost.

43.     Mercury's statement that interchange fees and other dues and assessments would be passed on at cost is and was false.  Mercury did not charge Plaintiffs and the other Class members "actual interchange rates and assessments published by VISA [and] MasterCard."   Instead, as detailed below, Mercury significantly inflated, and inflates, both interchange rates and card association access fees for its own benefit.

44.     The Merchant Application is accompanied by a set of terms called "Card Services Terms & Conditions."   The terms set forth in this portion of the document state, "Merchant pricing appears in the Card Services Fee Schedule of the Merchant Application."   *See* Exhibit A at 11.

45.     The terms also indicate that merchants will be charged "access fees" (that is, card association fees or dues and assessments), which are to be "displayed as a separate item on Merchant's monthly statement."   *Id.*  In the terms, Mercury further represents that such fees may incorporate fees imposed "by both the

16

applicable card association and Member [i.e., the card issuing bank or financial institution] or Global Direct [i.e., Global]." *Id.*

46.    Merchants, including Plaintiffs and the other Class members, reasonably understood and understand this language to mean that card association access fees will be displayed on their monthly statements separately from other charges, including from charges imposed by Mercury.

47.    Further, merchants, including Plaintiffs and the other Class members, reasonably understood and understand this language to mean that fees imposed by the card associations will not be inflated or marked up by Mercury, since Mercury is not "the applicable card association," the "Member," or "Global Direct." Merchants, including Plaintiffs and the other Class members, understand that Mercury would pass its costs through to them and to separately display those costs on merchants' monthly statements, per the plain language of the terms.

48.    These statements, too, are false because Mercury is and has for the duration of the Class Period been artificially inflating card association access fees, such as the MasterCard NABU fees and VISA APF fees.  Mercury marks those fees up and retains the difference between the actual published fees (owed to the card associations) and the inflated fees.  Mercury falsely states that the identified third parties (card associations, card issuing banks or financial institutions, or

Global) "may" increase these fees, when in reality Mercury intends to, and does, inflate these fees for its own gain.

49.    The terms further state that merchants will be charged a "PCI fee," which refers to a fee relating to Payment Card Industry compliance. *Id.* Mercury does in fact charge merchants, including Plaintiffs and the other Class members, a PCI fee. But Mercury falsely represents that the PCI fee will be assessed by "Member" (i.e., the card issuing banks or financial institutions) or Global. *Id.* at 11-12. In reality, neither the card issuing banks or financial institutions nor Global imposes such a fee. Mercury alone imposes the PCI fee and retains the revenue it generates.

50.    The Merchant Application and the Card Services Terms & Conditions become the "Merchant Agreement" if a merchant submits a completed application and Mercury accepts it. At that point, the merchant may submit transactions to Mercury for processing, and Mercury will initiate credit and debit entries in the merchant's bank account.

51.    In a document called "Operating Guide" published on its website (www.mercurypay.com), and attached to this complaint as Exhibit B, Mercury again states that certain charges (including the MasterCard NABU fees and VISA APF fees) will be "billed separately," but fails to disclose that these itemized

18

charges will be marked up solely by Mercury and for Mercury's benefit.  *See* Exhibit B at 110-111.  By purporting to separately identify card association access fees on merchants' monthly statements, Mercury purposefully and intentionally deceives merchants into believing that those rates are *actual* assessments that do not include an arbitrary mark-up from Mercury.

C.  *Mercury Defrauds Its Merchant Clients In Each Monthly Statement*

52.    Mercury provides its merchant clients with monthly statements reflecting the prior month's activity and the charges associated with that activity. Mercury also utilizes the monthly statement platform to communicate directly with merchants, as it frequently includes messages relating to impending changes to fee structures and other matters.  Mercury's monthly statements are intended to, and do, induce merchants to continue purchasing Mercury's payment processing services.

53.    In each monthly statement, Mercury represents that fees or charges required by third parties, such as the card associations and card issuing banks or financial institutions, have been passed through to the merchant at cost, and that Mercury's fees are separately identified.  This representation is communicated in Mercury's use of line items that purport to reflect the MasterCard NABU fees, VISA APF fees, and applicable interchange rates for different card types charged

for the month.  But in fact, Mercury substantially and deceptively inflates the rates it attributes, in its monthly statements, to VISA, MasterCard, and the card issuing banks or financial institutions, so the MasterCard NABU rate, VISA APF rate, and various interchange rates identified in the monthly statements are false and deceptive.

54.    Plaintiffs attach to this complaint a series of monthly statements prepared by Mercury, each of which reflects fraudulent statements and omissions pertaining to the interchange rates, MasterCard NABU fees, and VISA APF fees charged by Mercury.

55.    For instance, in a September 28, 2012 statement, Mercury charged Plaintiff Champs a VISA credit card APF fee of $0.0295, or 2.95¢, per VISA credit card transaction, when the true fee should have been 1 cent cheaper, at $0.0195, or 1.95¢.  The MasterCard NABU fee, which is billed at $0.0285, or 2.85¢, per transaction, should have been billed at $0.0195, or 1.95¢.  *See* Exhibit C (Champs statement for Sept. 28, 2012) at 5.

56.    In the same statement, Mercury inflated the VISA debit card APF fee to $0.0295, or 2.95¢, per VISA debit card transaction, when the true fee should have been 1.4¢ cheaper, at $0.0155, or 1.55¢.  *See id.*

57.    Over time, Mercury increased its inflation of these fees.  By April 2013, Mercury had begun inflating the MasterCard NABU and VISA APF fees charged to Champs by 4 cents per transaction.  As reflected in Exhibit D, an invoice dated April 30, 2013, Mercury charged Champs a MasterCard NABU fee of $0.0585, or 5.85¢, per transaction, and VISA APF fees (for both credit and debit cards) of $0.0595, or 5.95¢, per transaction.  The true MasterCard NABU fee and VISA credit card APF fee was $0.0195, or 1.95¢.  The true VISA debit card APF fee was $0.0155, or 1.55¢.  Thus, Mercury inflated the MasterCard NABU fee by 3.9¢ per transaction, the VISA credit card APF fee by 4¢ per transaction, and the VISA debit card APF fee by 4.4¢ per transaction.

58.    By June 2013, Mercury had increased the MasterCard NABU fee to match the VISA APF fees.  As shown in Exhibit E, Mercury charged Champs a MasterCard NABU fee of $0.0595, or 5.95¢, per transaction, starting in June 2013. For the remainder of Champs' relationship with Mercury, which terminated in or around March 2015, Mercury charged MasterCard NABU and VISA APF fees of $0.0595, or 5.95¢, per transaction.

59.    Mercury also overcharged Sam Malouf for card association access fees.  As shown in Exhibit F, a statement dated February 28, 2014, Mercury charged Sam Malouf MasterCard NABU fees and VISA APF fees (for both credit

and debit cards) of $0.0295, or 2.95¢, per transaction.  This practice continued for the duration of Sam Malouf's business relationship with Mercury, which terminated in or around May 2015.

60.    Mercury's monthly statements reflect inflated interchange rates as well.  For example, although the applicable interchange rate for a "VISA Rewards 1" credit card was, and is, 1.65% of the transaction amount plus 10 cents per individual transaction, Plaintiff Sam Malouf's March 2015 statement indicates that Mercury charged a rate of 2.5% (plus $0.10 per transaction), inflating the applicable rate by, in this case, 85 basis points, or 0.85%.  In other words, rather than multiplying the total dollar amount of transactions using that card type by 1.65%, as the published interchange rate requires, Mercury multiplied it by 2.5%, pocketing the difference.  In this single instance, the 0.85% inflation of the VISA Rewards 1 interchange rate netted Mercury a sum of $238.65 over and above the actual interchange charge Mercury should have made.

61.    This exemplar interchange overcharge calculation was computed in the following way.  The statement shows that Sam Malouf's customers, during the month covered by the statement, used VISA Rewards 1 credit cards to purchase $28,075.82 worth of merchandise, in 26 separate transactions.  The interchange fee charged by Mercury is $704.50.  This figure includes both the percentage-based

fees and the fixed per-sale fee associated with each of the 26 individual transactions.   Assuming Mercury charged the permissible rate of $0.10 per transaction, Mercury charged Sam Malouf $2.60 in fixed per-sale fees.  That leaves $701.90 in percentage-based fees.   $701.90 is 2.50% of the total sales figure, $28,075.82.  Had Mercury used the proper interchange rate for this type of card – 1.65% – Mercury would only have charged Sam Malouf $463.25.  The difference between the fee Mercury charged ($701.90) and the permissible fee ($463.25) is $238.65.  This represents Mercury's inflation of the VISA Rewards 1 interchange rate for the month of March 2015.

62.    Mercury inflated the interchange rates applicable to each Plaintiff's transactions throughout the Class Period.  This inflation is represented in each monthly invoice and can be quantified by comparing the rates Mercury used against the published interchange rates.

63.    In addition to falsely representing that interchange rates and card association access fees have been passed through to merchants at cost, and that Mercury's fees are separately identified (or omitting to state that Mercury has included its own artificial inflation in those fees), Mercury's monthly statements are fraudulent because the messages Mercury includes falsely indicate that Mercury's pricing is based on a true interchange-plus model, when in reality it is

not.  For example, Champs' June 2013 statement includes the following message:

"Effective July 1, 2013, some merchants may see increases to both MasterCard's

NABU fee and VISA's APF fee, which will continue to appear as separate line

items on your merchant statement.  These fees may include fees imposed by both

the card associations and Global Payments."  *See* Exhibit E at 6.

64.    This message – which appeared on statements for all Class members

having a Mercury account as of June 2013 – informs merchants that the

MasterCard NABU fee and/or VISA APF fee may include fees imposed by third

parties, *not* Mercury.  Accordingly, it is false.

65.    In addition, by purporting to separately identify card association fees

as independent line items, Mercury purposefully and intentionally misrepresents

that those fees do not include Mercury's artificial inflation of those fees, and/or

fails to disclose that those fees include inflation added by Mercury.

66.    Mercury's fraudulent representations and omissions in its monthly

statements induced merchants, including Plaintiffs and the other Class members, to

continue purchasing Mercury's services.   Had Plaintiffs and the other Class

members known that Mercury's monthly statements included inflated card

association access fees and interchange fees, they would have terminated their

relationships with Mercury and demanded a return of the amounts by which Mercury overcharged them.

67. Mercury also imposes unwarranted and unauthorized fees on its merchants. For example, Mercury charged each Plaintiff a monthly maintenance fee (described as "MON MAINT" in statements) of $15.95 or $25.95, but the Merchant Application executed by each Plaintiff expressly provides that no such monthly maintenance fee will be charged. (The amount identified for "Account Maintenance Fee (per month)" is "$0.00" in each Plaintiff's completed Merchant Application.)

68. As alleged above, Mercury also charges its merchants a "PCI fee" purportedly for costs associated with ensuring compliance with privacy and fraud-prevention standards. These fees are described in the Card Services Agreement as having been imposed by member banks or Global, but in fact, Mercury imposes this fee and retains the revenues it generates. Each Plaintiff was charged $24.95 per month for this fee, which is unauthorized.

69. Mercury also imposes a fee *in addition to the "PCI" fee* for "regulatory compliance," denoted "REG COMP" on monthly statements. Mercury charged Sam Malouf $79.95 per month for regulatory compliance, but no provision in the Card Services Agreement or other document authorizes Mercury to charge

this fee, and Sam Malouf never agreed to pay this fee.  It is unclear when Mercury first began charging this "REG COMP" fee, but Plaintiffs attach as Exhibit G an invoice from Mercury to Sam Malouf dated May 29, 2015 reflecting this charge. Plaintiffs believe that all merchants with accounts as of (at least) May 2015 were charged this unwarranted and unauthorized fee.

70.    Plaintiffs believe that Mercury may be otherwise charging improper and excessive fees that will be uncovered through discovery.

## CLASS ACTION ALLEGATIONS

71.    Plaintiffs bring this action individually and on behalf of all others similarly situated as a class action pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

72.    The Class is defined as follows:

All persons or entities that were charged (a) an inflated NABU, APF, or other access fee, and/or (b) an inflated interchange rate, and/or (c) any other fee not authorized by the Card Services Agreement during the time period relevant to this action.

73.    Excluded from the Class are Defendant and its subsidiaries, parents, and affiliates; all persons who make a timely election to be excluded from the Class; all claims for wrongful death, survivorship, and/or personal injury by Class members; governmental entities; and the judge to whom this case is assigned and

his/her immediate family.  Plaintiffs reserve the right to revise the Class definition based on information learned through discovery.

74.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

75.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**    The members of the Class are so numerous that individual joinder of all the members is impracticable.  On information and belief, there are not less than tens of thousands of merchants that have been damaged by Mercury's wrongful conduct as alleged herein.  The precise number of Class members and their addresses is presently unknown to Plaintiffs, but may be ascertained from Mercury's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

76.    **Commonality and Predominance – Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).**  Numerous common questions of law and fact exist as to Plaintiffs and the other Class members.  Such questions include, but are not limited to:

27

a.      Whether Mercury has acted and continues to act unlawfully by inflating fees charged to merchants, including Plaintiffs and the other Class members, for Mercury's own benefit;

b.      Whether Mercury has acted and continues to act unfairly by inflating fees charged to merchants, including Plaintiffs and the other Class members, for Mercury's own benefit;

c.      Whether Mercury has acted and continues to act deceptively, misleadingly, unfairly, unlawfully, and/or fraudulently by inflating fees charged to merchants, including Plaintiffs and the other Class members, for Mercury's own benefit;

d.      Whether Mercury is liable to Plaintiffs and the other Class members for its practice of inflating fees charged to merchants for Mercury's own benefit;

e.      Whether Mercury should be enjoined from engaging in any or all of the unlawful, unfair, and/or fraudulent practices complained of herein.

Mercury has engaged in a common course of conduct toward Plaintiffs and the other Class members.  The common issues arising from this conduct that affect Plaintiffs and the other Class members predominate over any individual issues.

Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

77.     **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all members of the Class were comparably injured through the uniform misconduct described above.

78.     **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members they seek to represent; Plaintiffs have retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiffs intend to prosecute this action vigorously.  Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

79.     **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**  Mercury has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive and declaratory relief, as described below.

80.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient

adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and each of the other Class members are small compared to the burden and expense that would be required to individually litigate their claims against Mercury, thus rendering it impracticable for Class members to individually seek redress for Mercury's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

### COUNT I: Declaratory and Injunctive Relief

81.     Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-80, above, as though fully set forth herein.

82.     Plaintiffs bring this claim individually and on behalf of all other Class members.

83.   Classwide declaratory relief is appropriate where a defendant has "acted or refused to act on grounds generally applicable to the class."

84.   Mercury has attempted to immunize itself from legal claims by imposing adhesive, unconscionable, unfair, and draconian terms in its Card Service Agreement (Exhibit A) making it extremely costly to obtain relief from its fraudulent overbilling practices, as alleged in this complaint.  Such terms include those purporting to require merchants to pay attorneys' fees and other costs associated with any legal action, without regard to outcome; a limitation on liability to one month's worth of overcharges; a truncation of the statute of limitations for "billing errors" to only 90 days; and a prohibition on class action or other group litigation against it.

85.   Mercury has also included provisions in the same document purporting to give Mercury the right to alter the agreed-upon fee structures and charges for any or no reason, without notice to merchants.

86.   These provisions are unenforceable as unconscionable, lacking mutuality, illusory, and/or in violation of public policy.

87.   This Court has the authority under the Declaratory Judgment Act, 28 U.S.C. §2201 et seq., and other applicable law to issue a declaratory judgment and

other corresponding relief, including an injunction, to redress the unconscionable provisions in the Card Services Agreement.

88.    A judicial declaration is necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to these provisions.

89.    In equity, this Court should declare these provisions unenforceable at the earliest opportunity in this litigation and enjoin the enforcement of these provisions.

## COUNT II: Fraudulent Omission

90.    Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-80, above, as though fully set forth herein.

91.    Plaintiffs bring this claim individually and on behalf of all other Class members.

92.    As alleged in this complaint, Mercury knew but failed to disclose that its pricing models included inflated or marked-up access fees, NABU fees, APF fees, and dues and assessments, as well as inflated or marked-up interchange rates and fees, and a variety of junk fees not authorized by the Merchant Application and Card Services Agreement, including the PCI fee, the monthly maintenance fee, and the regulatory compliance fee described above.

93.    Plaintiffs and the other Class members reasonably expected the payment processing services provided to them by Mercury would be based on an "interchange-plus" (or "cost-plus") basis, and that, accordingly, the access fees, NABU fees, APF fees, and dues and assessments, and the interchange rates and fees for which they would be charged would include only those fees required by the card networks.  Indeed, Mercury expressly stated that "[t]ransactions will be priced based on actual interchange rates and assessments published by VISA [and] MasterCard."  Exhibit A at 2.

94.    Plaintiffs and the other Class members executed the Merchant Application disclosing the permissible fees Mercury would charge them, and justifiably relied upon the terms of that document and the related Card Service Agreement, as alleged in this complaint.

95.    The nature and amount of fees Mercury charged to and collected from Plaintiffs and the other Class members were material to Plaintiffs and the other Class members.

96.    Had Mercury disclosed that it would not pass through the access fees, NABU fees, APF fees, and dues and assessments, or the interchange rates and fees, required by the card networks at cost – and would, in fact, mark up and overcharge

those fees – Plaintiffs and the other Class members would not have purchased card processing services from Mercury.

97.      Similarly, had Mercury disclosed that it would charge Plaintiffs and the other Class members various junk fees – such as the PCI fee, the monthly maintenance fee, or the regulatory compliance fee alleged herein – not authorized by the Card Services Agreement, Plaintiffs and the other Class members would not have purchased card processing services from Mercury.

98.      For the duration of the Class Period, Mercury, in fact, inflated the access fees, NABU fees, APF fees, and dues and assessments, and the interchange rates and fees, that it charged Plaintiffs and the other Class members, without authorization or disclosure of this fact.

99.      Furthermore, in each monthly invoice that Mercury provided to Plaintiffs and other Class members during the Class Period, Mercury failed to disclose that it had imposed inflated or marked up access fees, NABU fees, APF fees, dues and assessments, and interchange rates and fees, on a per-transaction basis.  Had Plaintiffs and the other Class members been apprised of the true facts – that Mercury had inflated or marked up the card association fees they were required to pay – they would not have continued obtaining credit card processing services from Mercury.

100.    Plaintiffs and the other Class members were damaged in an amount to be proven at trial as a result of Mercury's fraudulent omission and failure to disclose the true nature and amount of the fees it would charge them – and did charge them – during the Class Period.

101.    Accordingly, Plaintiffs seek monetary, declaratory, and injunctive relief, including attorneys' fees and costs of suit.

## COUNT III: Fraudulent Misrepresentation

102.    Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-80, above, as though fully set forth herein.

103.    Plaintiffs bring this claim individually and on behalf of all other Class members.

104.    Mercury expressly represented to each Plaintiff and other Class member that "[t]ransactions will be priced based on actual interchange rates and assessments published by VISA [and] MasterCard."  Exhibit A at 2.

105.    In fact, Mercury inflated both the access fees, NABU fees, APF fees, and dues and assessments, and the interchange rates and fees that it charged to Plaintiffs and the other Class members, as alleged above.

106.    Mercury also expressly represented to each Plaintiff and other Class member that it would charge no monthly maintenance fee.  This representation is

contained in the Merchant Application's "Account Maintenance Fee (per month)" line item.   As alleged above, each Plaintiff's completed Merchant Application states that this fee will be "$0.00," and Plaintiffs allege, on information and belief, that the same is true for each Class member.

107.   In fact, Mercury charged each Plaintiff a monthly maintenance fee (denoted "MON MAINT" in statements) of $15.95 per month to $25.95 per month.

108.   Mercury also expressly represented that any PCI fee charged to Plaintiffs and the other Class members would be imposed by Global or the card-issuing banks or financial institutions.   *See* Exhibit A at 11-12.   Mercury does in fact charge merchants, including Plaintiffs and the other Class members, a PCI fee. But neither the card issuing banks or financial institutions nor Global imposes such a fee.   Mercury alone imposes the PCI fee and retains the revenue it generates.

109.   Furthermore, each and every monthly statement supplied to Plaintiffs and the other Class members by Mercury contains additional fraudulent misrepresentations.

110.   By stating on those monthly statements that each Plaintiff has been charged more than $0.0195, or 1.95¢, in access fees (also known as NABU fees, APF fees, and/or dues and assessments) for each MasterCard or VISA credit card

transaction, and more than $0.0155, or 1.55¢, in access fees for each VISA debit card transaction, Mercury fraudulently misrepresents those charges.

111.   By stating on those monthly statements that each Plaintiff has been charged more than the published interchange rate for any particular card type – including without limitation the "VISA Rewards 1" card type described above – Mercury fraudulently misrepresents those charges as well.

112.   Had Mercury accurately represented that it would charge Plaintiffs and the other Class members unauthorized monthly maintenance fees, unauthorized PCI fees, unauthorized regulatory compliance fees, inflated card association access fees, and/or inflated interchange fees, Plaintiffs and the other Class members would not have obtained card processing services from Mercury, or would not have continued to obtain such services from Mercury.

113.   Plaintiffs and the other Class members were damaged in an amount to be proven at trial as a result of Mercury's fraudulent misrepresentations concerning the true nature and amount of the fees it would charge them – and did charge them – during the Class Period.

114.   Accordingly, Plaintiffs seek monetary, declaratory, and injunctive relief, including attorneys' fees and costs of suit.

## COUNT IV: Unjust Enrichment

115.   Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-80, above, as though fully set forth herein.

116.   Plaintiffs bring this claim individually and on behalf of all other Class members.

117.   As alleged in this complaint, Mercury was unjustly enriched at the expense of Plaintiffs and the other Class members, who were grossly and inequitably overcharged for card association access fees (that is, NABU fees, APF fees, and/or dues and assessments) and interchange rates and fees applicable to various card types, and were charged unauthorized junk fees, including monthly maintenance fees, regulatory compliance fees, and PCI fees.

118.   Plaintiffs and the other Class members were unjustly deprived of money obtained by Mercury as a result of its undisclosed, unfair, unscrupulous, and unconscionable inflation of the card association access fees, interchange fees, and unauthorized junk fees that Mercury charged to and collected from Plaintiffs and the other Class members.

119.   It would be inequitable and unconscionable for Mercury to retain the profit, benefit, and other compensation it obtained from Plaintiffs and the other Class members as a result of its wrongful conduct alleged in this complaint.

120.    Plaintiffs and the other Class members are entitled to seek and do seek restitution from Mercury as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by Mercury by virtue of its wrongful conduct.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in their favor and against Mercury as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.    An order declaring unconscionable and unenforceable certain provisions of the Card Services Agreement described above, including the provision requiring merchants to pay attorneys' fees and costs of legal action without regard to the outcome, limiting damages, imposing a 90 day statute of limitations, and prohibiting class actions;

C.    An order requiring Mercury to return all sums obtained from Plaintiffs and the other Class members as a result of its unlawful, fraudulent, deceptive, misleading, and unfair business practices;

D.    Actual damages in an amount to be proven at trial;

E.      Punitive damages pursuant to O.C.G.A. §51-12-5.1 in an amount to be proven at trial on the ground that Mercury's actions have shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences has acted wantonly, willfully, and because Mercury has acted with specific intent to cause harm the statutory limitation on punitive damages is not applicable;

F.      Costs of suit and attorneys' fees pursuant to O.C.G.A. §13-6-11 and any other applicable law on the ground that Mercury has acted in bad faith, been stubbornly litigious and caused Plaintiffs and the Class unnecessary trouble and expense;

G.      Pre- and post-judgment interest on any amounts awarded;

H.      Such other or further relief as may be appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all claims so triable.

**DATED:**  December 31, 2015

Respectfully submitted,

/s/ Kenneth S. Canfield

**DOFFERMYRE SHIELDS**
**CANFIELD & KNOWLES, LLC**
Kenneth S. Canfield
Ga. Bar No. 107744

1355 Peachtree Street, Suite 1600
Atlanta, Georgia  30309
Tel: (404) 881-8900
kcanfield@dsckd.com

**GRANT & EISENHOFER P.A.**
Adam J. Levitt (to be admitted *pro hac vice*)
30 North LaSalle Street, Suite 2350
Chicago, Illinois  60602
Tel: (312) 214-0000
Fax: (312) 214-0001
alevitt@gelaw.com

**GRANT & EISENHOFER P.A.**
Kyle J. McGee (to be admitted *pro hac vice*)
123 Justison Street
Wilmington, Delaware  19801
Tel: (302) 622-7000
kmcgee@gelaw.com

**THE DICELLO LAW FIRM**
Mark DiCello (to be admitted *pro hac vice*)
Mark Abramowitz (to be admitted *pro hac vice*)
7556 Mentor Avenue
Mentor, Ohio  44060
Tel: (440) 953-8888
madicello@dicellowlaw.com

***Counsel for Plaintiffs and the Proposed Class***

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, in compliance with Local Rule 5.1(c), that the foregoing

Complaint has been prepared using 14-point Times New Roman font.

/s/ Kenneth S. Canfield