### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| CHAMPS SPORTS BAR & GRILL CO., FASHIONADVICE.COM, LLC d/b/a SAM MALOUF, ARCHER'S BARBEQUE, LLC, and WOKCHOW DEVELOPMENT, LLC, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | Case No. 1:16-CV-00012-MHC |
| MERCURY PAYMENT SYSTEMS, LLC and GLOBAL PAYMENTS DIRECT, INC., | |
| Defendants. | |

### PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS TO THE CLASS REPRESENTATIVES

*"The work done by class counsel in unraveling defendants' alleged misconduct was simply a work of art in my eyes.  To have achieved this with the risks class counsel faced is one of the best pieces of legal work I have ever observed."*

–- Michael J. Bowers, lawyer and former Georgia Attorney General

After more than a year and a half of hard-fought litigation, Class Counsel successfully negotiated a settlement with a cash fund of $52 million that, together with other relief, provides total benefits to the class in excess of $72 million.  To

compensate them for their successful efforts, Class Counsel hereby request the Court approve a $17.33 million fee and $175,000 expense reimbursement, as provided in the Settlement Agreement.   While not binding on the Court, the parties' agreement on these amounts is entitled to substantial weight where, as here, the negotiations were conducted at arm's length after the merits were settled.

The requested fee – representing one-third of the cash component of the Settlement and less than 25 percent of the total class benefit – is reasonable under the percentage of the benefit method adopted by the Eleventh Circuit in *Camden I Condominium Ass'n, Inc. v. Dunkle,* 946 F.2d 768 (11th Cir. 1991), and is supported by declarations from Hunter Hughes, the mediator who presided over the settlement negotiations, and two eminent Atlanta lawyers, Michael Bowers and Lawrence Ashe, who analyzed the record.  (*See* Exhibits 1, 2, and 3)  Further, the requested expenses were reasonably and necessarily incurred on behalf of the class.   Accordingly, the request for fees and expenses should be approved.

Class Counsel also request that the Court approve service awards of $20,000 to each class representative, as provided by the Settlement.  The Settlement would not have been possible but for their service and willingness to accept the risk that they could be contractually liable for Defendants' attorneys' fees, even if they won the litigation.  The awards thus are legally and factually warranted.

2

## FACTUAL BACKGROUND

The background of this litigation was described in Plaintiffs' brief supporting preliminary approval (Doc. 76) and is further described in Plaintiffs' contemporaneous brief supporting final approval.   In this brief, Class Counsel will focus on their work to investigate and prosecute the claims at issue, which is detailed a joint declaration from Class Counsel.  (*See* Exhibit 4)

### Filing of the *Archer's Barbeque* and *Champs Sports Bar* Actions

Class Counsel began investigating potential abuses by payment card processors nearly three years ago when Adam Levitt was approached by a small merchant who suspected he was being overcharged.  The facts were not easy to determine.  Monthly invoices sent to merchants typically are obtuse, the payment card processing industry is complex, and relevant information is hard to come by. Mr. Levitt associated Ken Canfield and together they spent months researching the facts and law, interviewing industry insiders and those with specific knowledge about particular processors' practices, consulting with experts, and reviewing numerous contracts and billing records.  (Class Counsel Decl., ¶ 9)

In August, 2015, Mr. Levitt and Mr. Canfield filed in this Court what they believe is the country's first class action by merchants against a payment card processor alleging inflation of fees that should have been passed through at cost.

*See The Dinner Bell Café, Inc. v. North American Bancard, LLC,* No. 1:15-CV-03059-SCJ (N.D. Ga.).   The case remains pending before Judge Jones.   Soon thereafter, Mr. Levitt and Mr. Canfield began investigating similar allegations involving Mercury Payment Systems, LLC and, on January 4, 2016, filed this action.  (Class Counsel Decl., ¶ 10)

Working independently of Mr. Canfield and Mr. Levitt, two other lawyers – David Buckner and Adam Webb – were conducting their own investigation involving Mercury and its business partner, Global Payments Direct, Inc. Beginning in the summer of 2015, Mr. Buckner and Mr. Webb spent considerable time reviewing the law, consulting with experts, interviewing former Mercury employees, and examining the contracts and billing records of numerous Mercury customers.  On October 9, 2015, Mr. Buckner and Mr. Webb filed against Mercury and Global in the Superior Court of Fulton County.  In December, 2015, the case was removed to this Court. *See Archer's Barbeque, LLC v. Mercury Payment Systems, LLC,* No. 1:15-cv-4311-MHC (N.D. Ga.). (Class Counsel Decl., ¶ 11)

**Consolidation of the *Archer's Barbeque* and *Champs Sports Bar* Actions**

Mr. Canfield and Mr. Levitt moved to consolidate the *Archer's Barbeque* and *Champs Sport Bar* actions and, thereafter, Plaintiffs' counsel in the two actions agreed to work together on behalf of the proposed class members.  The Court

granted the motion to consolidate on March 31, 2016.  (*Id.,* ¶ 12)

Before consolidation, the *Archer's Barbeque* Plaintiffs moved for partial summary judgment to invalidate restrictive provisions in Defendants' form contract, including a class action waiver, damages limitation, shortened statute of limitations, and requirement that they pay defendants' legal fees regardless of the outcome.  After the parties negotiated a comprehensive scheduling order that was approved by the Court, defendants moved to dismiss and to stay consideration of plaintiffs' motion for partial summary judgment.  Both motions were fully briefed, and the Court stayed proceedings pending their resolution.  (*Id.,* ¶ 13)

After consolidation, all parties met, conferred and proposed a new case management order, which the Court adopted at a status conference on May 20, 2016.  After Plaintiffs filed a consolidated amended complaint, Defendants moved to dismiss the fraud and RICO claims.  The motion to dismiss was fully briefed. The parties agreed to a proposed order governing ESI and competing proposals on confidentiality; crafted a discovery plan; served initial disclosures; and, after the Court agreed to partially open discovery at a status conference on August 5, 2017, exchanged interrogatories and document requests.  (*Id.,* ¶ 14)

## The Mediation, Settlement Negotiations, and Agreement

The parties first raised the issue of settlement during the Rule 26(f)

conference required by the local rules.  Sensing mutual interest in beginning discussions concerning possible resolution, the parties proposed in the Joint Preliminary Report and Discovery Plan that they mediate before the end of January 2017.  On October 5, 2016, the parties informed the Court they wished to discuss settlement immediately and requested the Court defer a ruling on the pending motion to dismiss.  The Court granted the request.  (*Id.,* ¶ 15)

The parties retained a well-respected Atlanta mediator, Hunter Hughes III, who scheduled a face-to-face session for December 20, 2016.  Under Mr. Hughes' supervision, the parties spent several months identifying and exchanging the substantial amount of information needed for the mediation to be productive, including contracts, invoices, and other relevant records from Plaintiffs and from Defendants, among other things, voluminous records and data relating to Plaintiffs and the proposed class, such as the number and type of its customers; the volume, number and revenue from transactions processed during the class period; and the contracts and transactional data for a statistically significant sample of their customer base.  (*Id.,* ¶¶ 16-17)

Class Counsel prepared extensively.  They worked with a team of forensic accountants to further investigate Defendants' practices, analyze the data, calculate damages, and create a presentation of their findings for use at the mediation.  The

cost of the experts' services was nearly $100,000, demonstrating the extent of their work.   Class Counsel also researched and wrote a mediation statement that, together with exhibits, was 426 pages in length; prepared a confidential damages statement for the mediator; studied Defendants' mediation statement; and consulted with Mr. Hughes.  (*Id.,* ¶ 18)

Despite the extensive preparation and a powerful presentation by Plaintiffs' experts, the December mediation was unsuccessful.   While still far apart, the parties made progress in understanding the facts and identifying the key issues, progress quickened by the presentation made at the mediation by Plaintiffs' experts.   At Mr. Hughes' request, the parties agreed to a second day of mediation and committed to exchange additional information and data.   Further, because of Defendants' skepticism a class could be certified, the parties extensively briefed the issue of class certification for the benefit of themselves and the mediator. Plaintiffs' brief alone was 61 pages.  (*Id.,* ¶ 19)

The second mediation, which took place on February 16, 2017, in Los Angeles at Mr. Hughes' request, also was unsuccessful.   Among other issues, Defendants presented a draft brief arguing the validity of the class action waiver in their contracts, which they insisted would be granted, ending the litigation. Plaintiffs disagreed.   To keep discussions going, Mr. Hughes asked Plaintiffs to

draft an opposition brief, which they served about ten days later.  He also asked Defendants to offer more money and Plaintiffs to draft a memorandum of understanding on the non-monetary terms being negotiated.  (*Id.,* ¶ 20)

During the following six weeks, the parties exchanged numerous offers and draft MOUs.  The negotiations were hotly contested and at several points almost broke down entirely.  Nonetheless, agreement was eventually reached on all terms except the amount Defendants would pay.  To break the impasse, Mr. Hughes made a mediator's proposal and gave the parties until April 17, 2017, to accept.  Both sides did.  The tentative deal was conditioned on approval of the MOU by the board of Mercury's holding company and execution of a comprehensive agreement.  The board approved the MOU on April 25, 2017.  (*Id.,* ¶ 21)

After the MOU was signed, the parties immediately began negotiating a comprehensive settlement agreement, which took nearly a month and proved to be quite contentious.  The parties finally reached a binding agreement and signed the settlement document on May 12, 2017.  (*Id.,* ¶ 22)  Class Counsel were scrupulous in avoiding discussion of the amount of fees, expenses or service awards until after the substantive terms of the Settlement had been resolved.  (Hughes Decl., ¶ 9)

## Post-Settlement Work

In addition to preparing the preliminary approval and final approval papers,

Class Counsel have worked closely with the Settlement Administrator and defense counsel to oversee the notice program and claims process; edited the website and claims documents; answered questions from class members; monitored the claims response; sent reminder notices to those who have not yet filed claims; and communicated with state attorneys general who requested more information.  Class Counsel's work will continue past the final approval hearing and not conclude until all claims are paid and the Settlement consummated.  (Class Counsel Decl., ¶ 23)

## ARGUMENT AND CITATION OF AUTHORITY

### I.    The Requested Fee is Reasonable

#### A.    The Common Fund Doctrine and Eleventh Circuit Law

It is well established that counsel whose work results in a substantial benefit to a class is entitled to a fee under the common benefit doctrine.  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  The doctrine serves the "twin goals of removing a potential financial obstacle to a plaintiff's pursuit of a claim on behalf of a class and of equitably distributing the fees and costs of successful litigation among all who gained from the named plaintiff's efforts."  *In re Gould Sec. Litig.*, 727 F. Supp. 1201, 1202 (N.D. Ill. 1989).  The doctrine also ensures those who benefit are not "unjustly enriched." *Van Gemert*, 444 U.S. at 478.

The controlling authority in the Eleventh Circuit on fees in common fund cases is *Camden I Condominium Ass'n, Inc. v. Dunkle,* 946 F.2d 768, 774-75 (11th Cir. 1991), which held that such fees must be determined based on the percentage of the benefit to the class as opposed to the lodestar approach that focuses on the time expended by class counsel multiplied by their hourly rates. *See, e.g., In re Checking Account Overdraft Litig.,* 830 F. Supp. 2d 1330, 1362 (S.D. Fla. 2011) ("The Eleventh Circuit made clear in *Camden I* that percentage of the fund is the exclusive method for awarding fees in common fund class actions.")

Under *Camden I,* the Court is afforded with discretion in choosing the proper percentage.  "There is no hard and fast rule … because the amount of any fee must be determined upon the facts of each case."  946 F.2d at 774.  While citing authority that "[t]he majority of common fund fee awards fall between 20 percent to 30 percent," noting some district courts were beginning to view 25 percent as the benchmark to be adjusted based on the circumstances, and announcing "an upper limit of 50 percent," the Eleventh Circuit instructed that in selecting the percentage for a particular case a district court should look to the criteria set out in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989) and other pertinent factors.  946 F.2d at 775.

In practice, following *Camden I,* fee awards in the Eleventh Circuit have averaged around one-third of the class benefit. *See Wolff v. Cash 4 Titles*, 2012 WL 5290155 at *5-6 (S.D. Fla. Sept. 26, 2012) (noting that fees in the Eleventh Circuit are "roughly one-third" and listing cases awarding fees of 30 percent or more); *see also, e.g., Waters v. Int'l Precious Metals Corp.,* 190 F.3d 1291, 1292-98 (affirming one-third); *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 2012 WL 12540344 at *6 and n. 6 (N.D. Ga. Oct. 26, 2012) (awarding a one-third fee and listing other similar cases); *Morefield v. NoteWorld, LLC,* 2012 WL 1355573 at *5 (S.D. Ga. Apr. 18, 2012) (one-third); *In re Checking,* 830 F. Supp. 2d. at 1367 (30 percent); *Allapattah Services., Inc. v. Exxon Corp*., 454 F.Supp.2d 1185, 1240 (S.D. Fla. 2006) (one-third).

That fee awards in the Eleventh Circuit are typically one-third of the class benefit is supported by Mr. Hughes, who has mediated fee agreements in hundreds of common fund cases, and is well-versed in the law. According to Mr. Hughes:

> In my experience, the overwhelming number of class action settlements that I have mediated in the Eleventh Circuit where the fee was based on a common fund approach have provided for fees of one-third of the class settlement fund. Indeed, my best estimate is that more than 90 percent of such settlements I have mediated in the Eleventh Circuit have provided for fees of approximately one-third of the class fund. The remaining common fund cases have had fee awards as high as 40% of the fund down to approximately 25 percent.

(Hughes Decl., ¶10). *See also* Ashe Decl., ¶ 14.

**B.**     **The Requested Fee is Supported by the *Camden I* Factors**

The fee requested by Class Counsel is one-third of the $52 million cash fund and less than 25 percent of the available benefit to the class, which includes not only the cash fund but also $20.5 million in credit options for which Current Customers are eligible.[1] This potential class benefit totals $72.5 million. (Class Counsel Decl., ¶ 27)   Whether analyzed as one-third of the fund or 24 percent of the total class benefit, the requested fee is supported by the *Camden I* and *Johnson* criteria. (Ashe Decl., ¶ 17; Bowers Decl., ¶ 7)  The criteria are addressed below.

> *(1)     The Time and Labor Involved*

Class Counsel have spent thousands of hours on the consolidated actions and estimate they will spend several hundred more hours before the litigation is over.

---

[1] That the entire fund may not be claimed and that not all of the available credit options may be chosen does not impact the fee analysis.  Fees are based on the total amount available to the class rather than the amounts claimed.  *See, e.g., Van Gemert*, 444 U.S. at 480 (class members' "right to share the harvest of the lawsuit, whether or not they exercise it, is a benefit of the fund created by the efforts of ... class counsel"); *Waters,* 190 F.3d at 1295-97 (affirming fee based on a percentage of the total available fund without regard to the amount of any reversion resulting from unclaimed funds); *Poertner v. Gillette Co*., 618 Fed. Appx. 624, 628-29 and n. 2 (11th Cir. 2015); *Masters v. Wilhelmina Model Agency,  Inc.*, 473 F.3d 423, 437-38 (2d Cir. 2007); *Williams v. MGM-Pathe Comm. Co.*, 129 F.3d 1026 (9th Cir. 1997) (holding a court abused its discretion by calculating fees based upon actual claims); *Pinto v. Princess Cruise Lines*, 513 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007) ("the percentage applies to the total fund created, even where the actual payment following the claims process is lower").

(Class Counsel Decl., ¶ 24)   Their work has included extensive pre-suit investigation; communicating with clients; finding and interviewing experts and former Mercury insiders; preparing complaints and written discovery; negotiating case management orders and similar documents; preparing for and attending hearings; researching and drafting hundreds of pages of briefs (on issues as varied as RICO, class certification, the validity of class action waivers); exchanging voluminous informal discovery and working with experts to analyze a huge database; mediating and drafting the Settlement; preparing the approval papers; working with the Settlement Administrator on the notice and claims programs; and encouraging Former Customers to file claims. (*Id.,* ¶ 25)  This work was justified, indeed essential, in view of the issues, the manner in which the case was defended, and the quality of the result.  (Bowers Decl., ¶ 10)  The first *Johnson* factor thus supports the requested fee.

(2)   <em>The Novelty and Difficulty of the Questions</em>

The case, which likely is the first national class action involving similar allegations to be brought to a successful resolution, involved a host of difficult and novel factual questions.  (Class Counsel Decl., ¶ 28)  For example, Class Counsel had to decipher a complex industry that defies transparency; comprehend almost inscrutable billing practices that allegedly were part of a sophisticated scheme to

defraud customers; and analyze voluminous documents and data covering a seven year period. The case also involved many difficult and novel legal issues, such as whether RICO can be used to challenge the propriety of billing for payment card processing services, whether a class action waiver is enforceable in a contract between businesses, and whether a class comprised of more than 200,000 merchants across the country can be certified. (*Id.*) This factor thus supports the requested fee. (Ashe Decl., ¶ 18)

### (3)    The Skill Requisite to Perform the Legal Service Properly

Proper case management and effective representation in any complex class action, particularly a national class action involving RICO claims and several hundred thousand class members, requires the highest level of experience and skill. This case certainly was no different. (Bowers Decl., ¶ 9)  Class Counsel had the necessary experience and skill. (Class Counsel Decl., ¶¶ 3-7)  Indeed, but for the reputation that Class Counsel have developed in prosecuting cases such as this one, it is unlikely that Defendants would have settled when they did. (Ashe Decl., ¶ 10)

### (4)    The Preclusion of Other Employment

If Class Counsel had not taken on this case, they would have been able to spend significant time on other matters. This is true whenever lawyers handle any significant matter requiring large amounts of time and thus supports a larger fee.

*(5)    The Customary Fee*

Complex civil litigation involving large groups of individuals and small businesses customarily is handled on a contingent fee because hourly rate fees are too expensive for individual class members to bear.  Such fees typically range from one-third to 40 percent.  *See, e.g., Blum v. Stemson*, 465 U.S. 886, 903 n.20 (1984) (noting the usual practice in tort litigation of contingent fees paying one-third of any recovery). As a result, the requested fee is within the customary range. (Class Counsel Decl., ¶ 29; Ashe Decl., ¶ 8; Bowers Decl., ¶ 16)

Consistent with the usual practice, moreover, Class Counsel and the class representatives entered into contingent fee agreements providing for payment of one-third percent to forty percent of any recovery.  (*Id.*)  The willingness of the class representatives to enter into such agreements is more evidence the requested award is reasonable. *See Blanchard v. Bergeron*, 489 U.S. 87 (1989) ("The presence of a pre-existing fee agreement may aid in determining reasonableness"); *Pharr v. Housing Auth.,* 704 F.2d 1216, 1218 (11th Cir. 1983) (such an agreement, although not binding, may be enforced if the fee agreed to is otherwise reasonable).

*(6)    Whether the Fee is Fixed or Contingent*

This action was prosecuted entirely on a contingent fee basis.  If Class Counsel had not achieved a recovery, they would have received nothing and, in

15

fact, would have suffered a substantial out-of-pocket loss because they were advancing all the litigation expenses, which easily could have amounted to several million dollars.   (Class Counsel Decl., ¶ 30; Bowers Decl., ¶ 13; Ashe Decl., ¶ 10) Such risk must be compensated and is a critical factor in analyzing the reasonableness of a fee.  *See, e.g. In re Dun & Bradstreet Credit Svcs. Cons. Lit.*, 130 F.R.D. 366, 373 (S.D. Ohio 1990); *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 548 (S.D. Fla. 1988), *aff'd,* 889 F.2d 21 (11th Cir. 1990).  A higher fee is necessary to account for this risk:

> It is axiomatic that attorneys who work on a contingent fee must charge a higher fee than those who work on a noncontingent basis. . . . This "higher" fee. . . is not a bonus.
>
> From a pure dollars and cents economic view, this higher fee is the appropriate measure of a reasonable fee that is required in the marketplace of services, (1) to induce the attorney to agree to assume the risk that no compensation will be received unless he or she successfully achieves a benefit for the client, and (2) if ultimately successful to compensate for the costs suffered and investment income foregone by delay in payment.

H. Newberg, *Attorney Fee Awards* § 1.08 (1986).

### (7)  *Time Limitations Imposed by the Client or the Circumstances*

Class Counsel worked under considerable time pressure at times due to various deadlines.  However, Class Counsel do not contend that this factor justifies either a higher or lower fee as time pressure in cases of this sort is expected.

(8)     *The Amount Involved and the Results Obtained*

The amount at issue and the result obtained justify the requested fee.  Class Counsel estimate the $52 million cash fund and total available benefits of $72.5 million represent a recovery of between 25 and 50 percent of the overcharges at issue.  (Class Counsel Decl., ¶ 31)   This recovery was achieved relatively quickly and in the face of substantial barriers to relief, any one of which had the potential to be fatal.  (Ashe Decl., ¶ 10)  This is an "excellent result" for the class under difficult circumstances and more than sufficient to justify the requested fee. (*Id.*, ¶ 18)  The nature of Class Counsel's achievement was summed up by Mr. Bowers:

> During the 43 years I have practiced law, I have participated in, overseen and reviewed hundreds of cases ranging in complexity from a statewide constitutional challenge over how Georgia elected superior court judges, to capital felony cases, to administrative disputes over certificates of registration for barbering.  Many of the cases ended up in the United States Supreme Court.  Yet, I have seen few, if any, as complex as this case.  The work done by class counsel in unraveling the defendants' alleged misconduct was simply a work of art in my eyes.  To have achieved this with the risks class counsel faced is one of the best pieces of legal work I have ever observed.

(Bowers Decl., ¶ 19)  Class Counsel are honored by such praise.

Class Counsel's accomplishment is even more impressive considering that Mercury stopped most of its challenged billing practices within a few months after suit was filed, lowering its monthly fees and collectively saving its Current Customers tens of millions of dollars. (Hughes Decl., ¶ 12; Class Counsel Decl., ¶

17

33)   This lawsuit undoubtedly was a substantial factor in causing Mercury to change its billing practice.  (*Id.*)  When even a few years of reduced billings in the future is added to the cash and credit options available under the Settlement, the litigation's benefit to the Class easily exceeds $100 million.

*(9) The Experience, Reputation, and Ability of the Attorneys*

According to Mr. Bowers:  "Few lawyers in Georgia have a combination of the factors necessary to successfully prosecute a case of this nature and complexity for plaintiffs who cannot afford to pay substantial legal fees on an hourly rate basis."  (Bowers Decl., ¶ 16)  Class Counsel had the necessary experience and skill and reputations for excellence in complex class actions such as this one, which contributed directly to the result they achieved.  (*Id.,* ¶ 19; Ashe Decl., ¶¶ 8, 12; Class Counsel Decl., ¶¶ 3-7)

Moreover, in evaluating this factor, the Court also should consider the quality of opposing counsel.  *See Camden I*, 946 F.2d at 772 n. 3; *Ressler v. Jacobson*, 149 F.R.D. 651, 654 (M.D. Fla. 1992).  Defendants were represented by skilled counsel from a prominent law firm (Ashe Decl., ¶ 10), requiring equally competent representation for the class.  *See generally Walco Invs. v. Thenen*, 975 F. Supp. 1468, 1472 (S.D. Fla. 1997) ("Given the quality of defense counsel from prominent national law firms, the Court is not confident that attorneys of lesser

aptitude could have achieved similar results").

### (10) The "Undesirability" of the Case

In *Johnson,* the court noted that civil rights attorneys who accept unpopular cases may suffer hardships deserving of a higher fee.  Class Counsel did not suffer such hardship.  As a result, this factor does apply here.

### (11) The Nature and Length of the Attorney-Client Relationship

Class Counsel did not have a prior relationship with the named plaintiffs and thus had no incentive to charge a lower fee in the hope of obtaining future business as is often done in a commercial setting.  As a result, this factor does not support an adjustment to the fee.  (Class Counsel Decl., ¶ 32)

### (12) Awards in Similar Cases

As noted above, whether calculated as one-third of the cash fund or 24 percent of the total available class benefit, the requested fee is consistent with results in similar cases in this circuit and district, where courts routinely award fees of one-third of the benefit.[2]  According to published studies, fees in common fund

---

[2] *See, e.g., Waters*, 190 F.3d 1291 (11th Cir. 1999) (affirming fee award of 33⅓ percent of $40 million fund most of ultimately reverted to the defendant); *Columbus Drywall,* 2012 WL 12540344 at *2 and n. 2 (awarding a one-third fee and listing similar awards); *Smith v. Floor & Décor Outlets of Am., Inc.,* No. 1:15-cv-04316-ELR (N.D. Ga. Jan. 10, 2017) (awarding one-third of a $14 million settlement); *Lunsford v. Woodforest Nat'l Bank*, No. 1:12-CV-103-CAP (N.D. Ga. May 19, 2014) (approving 1/3 fee of $7,750,000 fund); *In re Profit Recovery*

class actions typically average about what Class Counsel are seeking. *See, e.g., Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp.2d 942 (E.D. Tex. 2000) ("Empirical studies show that . . . fee awards in class actions average around one-third of the recovery"); *In re Checking Account Overdraft Litig.*, 2014 WL 11370115 at *18 (S.D. Fla. Jan. 6, 2014) (citing a 2010 study showing that awards in the Eleventh Circuit supported a fee of 30 percent of the settlement benefit).

### (13)   Other Factors Support the Requested Fee

Two other factors identified in *Camden I,* 946 F. 2d at 775, also support the requested fee, that is whether there are any substantial objections from the Class and the economics of prosecuting a class action.   *First,* while the deadline for doing so has not yet passed, no class member has objected, indicating that the

---

*Group Int'l, Inc. Sec. Litig.*, Civil Action No. 1:00-cv-1416-CC (N.D. Ga. May 26, 2005) (33⅓% ); *In re Clarus Corp. Sec. Litig.*, Civil Action No. 1:00-CV-2841-CAP (N.D. Ga. Jan. 6, 2005) (33⅓ percent); *In re Pediatric Servs. of Am., Inc. Sec. Litig.*, No. 1:99-CV-0670-RLV (N.D. Ga. Mar. 15, 2002) (33⅓ percent); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) ("courts across the country have, in the class action settlement context, *routinely* awarded class counsel fees in excess of the 25 percent 'benchmark,' even in so-called 'mega-fund' cases" and citing supporting examples) (emphasis added); *In re Managed Care Litig. v. Aetna,* 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003) (35.5% on settlement of $100 million); *Gutter v. E.I. Dupont De Nemours & Co.*, 95-2152-CIV-Gold (S.D. Fla. May 30, 2003) (33⅓% of $77.5 million settlement); *In re Terazosin Hydrochloride Antitrust Litig., 99-1317-MDL-Seitz* (S.D. Fla. Apr. 19, 2005) (33⅓% on settlement of over $30 million); *Tapken v. Brown*, 90-0691-CIV-Marcus (S.D. Fla. 1995) (33% of $10 million settlement).

Class agrees the fee is appropriate. *See, e.g., Strube v. Am. Equity Inv. Life Ins. Co.,* 2006 WL 1232816 at *2 (M.D. Fla. May 5, 2006) ("The lack of objections to a proposed fee award is itself important evidence that the fee arrangement is reasonable.").

*Second*, the economics of class actions require Class Counsel be adequately compensated; otherwise those who are wronged will find it increasingly hard to obtain good lawyers to take their cases.  As Mr. Bowers explains:

> The misconduct alleged to have been undertaken by the defendants in in this case are egregious.  Our society is made better off if such actions are remedied, both to deter others from engaging in similar actions and to compensate those who have been harmed.  However, the economics of the practice of law are such that without a sizeable financial incentive lawyers will not take on the role of a "private attorney general" and the type of misconduct defendants were alleged to have engaged in here likely will not be rectified.  Class counsel here ably filled the role of a private attorney general and should be appropriately rewarded for their efforts.  Failure to do so will discourage lawyers from taking on similar litigation in the future and thus undercut the deterrent impact of our laws designed to protect the public from wrongdoing.

(Bowers Decl., ¶ 17).  Many courts have also emphasized the importance of this factor in setting a fee. *See, e.g., Mashburn v. Nat'l Healthcare, Inc.,* 684 F. Supp. 679, 687 (M.D. Ala. 1988);  *Muehler v. Land O'Lakes, Inc.,* 617 F. Supp. 1370, 1375-76 (D. Minn. 1985) ("If the plaintiffs' bar is not adequately compensated for its risk, responsibility, and effort when it is successful, then effective

representation for plaintiffs in these cases will disappear.").

The economic risks posed by this case were particularly daunting considering such potentially fatal obstacles as the class action waiver and other restrictive terms in Defendants' form contracts, the need to certify a national class, and the many novel factual and legal issues involved.  While the case settled at a relatively early stage, the risk should be evaluated as of the time Class Counsel filed suit, not in hindsight. *See, e.g., Skelton v. General Motor Corp*., 860 F.2d 250, 258 (7th Cir. 1988), *cert. denied*, 493 U.S. 810 (1989) ("The point at which plaintiffs settle with defendants . . . is simply not relevant" to evaluating class counsel's risk);  *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp*., 540 F.2d 102, 112 (3d Cir. 1976); *Walco*, 975 F. Supp. at 1473.

## II.    The Court Should Give Great Weight to the Parties' Agreement

This Court is not bound by the parties' agreement and should not approve the requested fee unless it is reasonable.  Nonetheless, the parties' agreement is entitled to deference because it resulted from adversarial negotiations after the terms of the Settlement were decided.  *See, e.g., Ingram v. Coca-Cola Co.,* 200 F.R.D. 685, 695 (N.D. Ga. 2001); *Strube,* 2006 WL 1232816 at *2 (M.D. Fla. May 5, 2006).  As one court explained:

The Court finds that the fee and expense negotiations were conducted

at arm's length, only after the parties had reached agreement on all terms of the Settlement. There is no evidence in this case that the Settlement, or the fee and expense agreement, was in any way collusive. Under these circumstances, the Court gives great weight to the negotiated fee in considering the fee and expense request.

Such agreements between plaintiffs and defendants in class actions are encouraged, particularly where the attorneys' fees are negotiated separately and only after all terms of the settlement have been agreed to between the parties. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (noting that negotiated, agreed upon attorneys' fees are the "ideal" toward which the parties should strive and stating that "[i]deally, of course, litigants will settle the amount of a fee").

*Manners v. Am. Gen. Life Ins. Co.*, 1999 WL 33581944 at *28 (M.D. Tenn. Aug. 11, 1999) (some internal citations omitted); *see also, e.g., Johnson,* 448 F.2d at 720 (5th Cir. 1974) ("In cases of this kind, we encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorney's fees.")

Many reasons support deferring to the parties' agreement. There is no one "reasonable fee" mandated by applicable law, but as long as the requested fee is one that the Court agrees is within the range of what is reasonable, it should be approved. The agreement reflects the realities of the marketplace as the competing pressures and motives that drove the parties' positions ensured the fee was reasonable. And, if courts routinely reduce fees agreed upon by the parties, the inevitable result will be to make fee negotiations more difficult and discourage

competent counsel from taking risky and expensive class actions like this one.

III.   **The Expense Request Is Appropriate**

Class Counsel seek to be reimbursed for $175,000 in expenses as provided in the Settlement agreement, less than their total expenses to date.  (Class Counsel Decl., ¶ 35)  The expenses were necessarily and reasonably incurred in prosecuting the case; consist overwhelmingly of fees paid to experts; and do not include items typically billed by many lawyers, such as in-house copying, computerized legal research and  long distance telephone calls. (*Id.*; Bowers Decl., ¶ 18; Ashe Decl., ¶ 15)  The request thus should be granted.  *See, e.g., Waters,* F.3d at 1298 (class counsel are entitled to recover expenses as well as receive a fee).

IV.   **The Court Should Approve Service Awards to the Four Class Representatives**

Courts routinely approve service awards to compensate class representatives for their time and efforts on behalf of the class and to encourage them to serve in a representative capacity.  *See, e.g., Ingram,* 200 F.R.D. at 695-96 ($300,000 service awards); *In re Checking,* 2014 WL 11370115 at *12-13 ($10,000); *Spicer v. Chi. Bd. Options Exchange, Inc.*, 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993) (collecting cases approving awards ranging from $5,000 to $100,000).  The service awards specified by the Settlement – $20,000 to each of the four class representatives – are justified.  (Ashe Decl., ¶ 15)  Not only did the class

representatives devote substantial time to this litigation, they exposed themselves to substantial risk that they could have been held liable for the defense legal fees and expenses, regardless of the outcome, if provisions in their merchant agreements were enforced.   But for the class representatives' service and willingness to bear this risk, other class members would have received nothing. (Class Counsel Decl., ¶ 35)

## CONCLUSION

For the reasons set forth above, Class Counsel request that the Court approve $17.33 million in attorneys' fees, reimbursement of costs in the amount of $175,000, and services awards of $20,000 to each of the class representatives.

/s/ Kenneth S. Canfield
Kenneth S. Canfield
 Georgia Bar No. 107744
Jonathan M. Palmer
 Georgia Bar No. 453452
DOFFERMYRE SHIELDS
   CANFIELD & KNOWLES LLC
1355 Peachtree Street, NE, Suite 1900
Atlanta, Georgia  30309
Telephone: 404-881-8900
kcanfield@dsckd.com
jpalmer@dsckd.com

/s/ E. Adam Webb
E. Adam Webb
 Georgia Bar No. 743910
Matthew C. Klase
 Georgia Bar No. 141903
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
Telephone: 770-444-0773
Adam@WebbLLC.com
Matt@WebbLLC.com

<u>/s/ Adam J. Levitt</u>
Adam J. Levitt
DiCello Levitt & Casey LLC
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois  60602
Telephone:  312-214-7900
alevitt@dlcfirm.com

<u>/s/ David M. Buckner</u>
David M. Buckner
Seth Miles
BUCKNER + MILES
3350 Mary Street
Miami, Florida  33133
Telephone: 305-964-8003
david@bucknermiles.com
seth@bucknermiles.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, in compliance with Local Rule 5.1(c), that the foregoing

motion and brief has been prepared using 14-point Times New Roman font.

<u>*/s/ Kenneth S. Canfield*</u>
Kenneth S. Canfield

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 31 day of July, 2017, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which automatically sends email notification of such filing to all attorneys of record.

*/s/ Kenneth S. Canfield*
Kenneth S. Canfield