## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| CHAMPS SPORTS BAR & GRILL CO., FASHIONADVICE.COM, LLC d/b/a SAM MALOUF, ARCHER'S BARBEQUE, LLC, and WOKCHOW DEVELOPMENT, LLC, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>        v.<br><br>MERCURY PAYMENT SYSTEMS, LLC and GLOBAL PAYMENTS DIRECT, INC.,<br><br>    Defendants. | Case No. 1:16-CV-00012-MHC |

## PLAINTIFFS' SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR FINAL APPROVAL AND MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS

The objection deadline in this case was August 14, 2017. As of July 31, 2017, when Plaintiffs moved for final approval of the settlement and filed their application for fees, expenses, and service awards, none of the approximately 200,000 class members had objected. Between July 31 and August 14, a total of four objections were filed by Aaron Webster, Leighasta, Inc., Jason's Deli, and Advanced Nutrition Center. (Docs. 83, 87, 88, 90) That only four class members

have objected – representing 0.00002 percent of the class – is strong evidence of the fairness of the settlement, requested fees and expenses, and service awards. *See, e.g., In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*, 2016 WL 6902351, at *4 (N.D. Ga. Aug. 23, 2016) (objections from an "infinitesimal percentage" of the class indicates "strong support for the settlement" and weighs strongly in favor of final approval.").

The Court struck Mr. Webster's objection on August 23, 2017 for failure to comply with the requirements of the preliminary approval order. The other three objections have been withdrawn.[1] Consequently, no active objections remain before the Court and thus there is no reason for the Court to consider them. Indeed, the Court should disregard the objections in their entirety. Nonetheless,

---

[1] In its final approval order, the Court should approve the withdrawals pursuant to by Rule 23(e)(5). The goal of this rule was to dissuade professional objectors, although that goal has not been achieved. W. Rubenstein, *Newberg on Class Actions,* § 13:34 (5th ed.). The Advisory Committee notes suggest that little inquiry is needed where, as here, an objection raises individualized matters or its disposition does not affect the settlement or the objector's participation in it. *See Glass v. UBS Financial Services, Inc.,* 2007 WL 160948, at *2 (N.D. Cal. Jan. 17, 2007). The Leighasta objection was withdrawn because it was unauthorized and those who filed it lacked standing to do so. (Doc. 96) The other two objections were filed by small business owners appearing *pro se* who no longer object and have opted out of the class. Further, none of the former objectors offers anything useful to the Court's analysis. Leighasta, when deposed, admitted it lacks any relevant knowledge and all but disavowed its objection to the requested fee. (Doc. 97 at 9-10) The other two former objectors were not deposed, but, as described later in this brief, their objections provide no helpful information.

because the objections are in the record, Class Counsel have decided to address their substance.[2]  As shown below, the objections are utterly without merit.

## ARGUMENT

Considered in their totality, the four objectors primarily argued that:  (1) Class Counsel did not do sufficient discovery or other work to evaluate the case for settlement purposes; (2) the amount of the settlement fund is inadequate in relation to the range of potential recoveries; and (3) the fee requested by Class Counsel is too large.  None of these arguments withstands scrutiny.[3]

---

[2] In so doing, Class Counsel emphasize that their response is hamstrung because only one of the objectors, Leighasta, was deposed; the two *pro se* objectors produced no documents; and Mr. Webster defied the Court's order.  Class Counsel anticipate that, with the benefit of depositions and documents, they would have been able to demonstrate unequivocally that the objectors' statements about the amount of overcharges they paid were wrong; that each objector's arguments were based upon a factual misunderstanding or falsely asserted for improper motives; and that the benefits of the settlement to them are fair, reasonable, and adequate. Nevertheless, even the limited record discloses that the objections lack merit.

[3] While the objectors make other arguments, only two deserve comment.   First, Leighasta incorrectly argues it is unfair that former customers must file a claim. Because current customers have bank accounts linked to their Mercury accounts, paying them automatically is both justified and logistically easy.   Former customers do not have such accounts or a continuing relationship with Mercury. Sending out 100,000 checks without requiring certification the recipients are class members would create an unacceptable risk of fraud.   Second, Mr. Webster's argument that two Supreme Court decisions from before the Civil War prohibit service awards flies in the face of prevailing practice and appears motivated more to generate a fee for a professional objector than benefit the class, who on average would only receive an additional $0.40 if no service awards are made.

**(1)**     <u>**Class Counsel Were Well Prepared to Evaluate the Case for**</u>
          <u>**Purposes of Settlement**</u>

Class Counsel believe the settlement represents an excellent result for the class, a belief that is based upon their collective experience; extensive pre-filing investigations; the contracts and monthly statements of their clients; legal research and briefing; the fees and rules published by Visa and MasterCard; discussions with Defendants' former employees and other knowledgeable industry insiders; analysis of the data and information provided by Defendants during initial discovery and the mediation process; and the analysis of GlassRatner, a well-respected forensic accounting firm that, at a cost of nearly $100,000, formed the basis for a reasonable estimate of class-wide damages. (Doc. 82-4, ¶¶ 8-20)

The extent of Class Counsel's pre-suit investigations is reflected in the allegations of the consolidated complaint, which describes Defendants' billing practices and fraudulent scheme, details the three types of improper fees Mercury collected, and specifically refers to matters that would only be known to Mercury and its former employees. *See In re Home Depot Customer Data Security Breach Litig.,* 2016 WL 6902351, at *6 (the "fact intensive" consolidated complaint filed by class counsel demonstrated they understood the merits of the case and thus had sufficient information to evaluate settlement). Class Counsel's deepening understanding of the relevant facts and law is shown by the briefs they filed in

opposition to Defendants' motion to dismiss the fraud and RICO claims and in support of partial summary judgment on the restrictive provisions in Defendants' form contracts banning class actions, limiting damages, and shortening the statute of limitations.

During the mediation process, Class Counsel obtained still more information about Defendants and their billing practices, which enabled them to prepare a 465 page mediation statement (including exhibits) that identified and thoroughly evaluated the legal and factual issues; gave the mediator a separate, ten page memo assessing damages; and drafted voluminous briefs on class certification (Plaintiffs' brief alone was 61 pages) and the issue of whether the class action ban in Defendants' contracts was enforceable.  (Doc. 82-4, ¶¶ 18-20)  Class Counsel also studied Defendants' mediation statement and brief, and collectively spent hundreds of hours in face-to-face and telephone meetings with the mediator and defense counsel, testing their assessments about the case and refining their evaluation of the risks and potential rewards of continued litigation.

Only after reviewing all of this material, and spending several thousand hours obtaining a thorough understanding of the strengths and weakness of both sides of this case, did Class Counsel agree to a settlement.  At Class Counsel's request, Mike Bowers, a prominent and experienced Atlanta attorney, evaluated

what they did and the resulting settlement they achieved.  Mr. Bowers summed up his opinion by stating:  "The work done by class counsel in unraveling the defendants' alleged misconduct was simply a work of art in my eyes.  To have achieved this with the risks class counsel faced is one of the best pieces of legal work I have ever observed."  (Doc. 82-2, ¶ 19)

The objectors largely ignored all of this evidence, basing their argument that Class Counsel did not do sufficient work to evaluate the pros and cons of settling on the fact that the settlement occurred "quickly" and before any depositions were taken.  Setting aside the fact that the litigation had been pending for over eighteen months before it was settled, there is nothing wrong with an early settlement.  *See Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992) ("[t]he law is clear that early settlements are to be encouraged").  Early settlements save considerable time and expense and provide immediate benefits to class members, avoiding years of delay.  In fact, presumably for that reason, this Court's Local Rules require the parties to discuss settlement at the Rule 26(f) conference shortly after the complaint is filed and well before discovery typically begins.

Similarly, no rule of law precludes a settlement before any depositions are taken.  Courts routinely approve class settlements before discovery has opened.  *See, e.g., In re Home Depot Customer Data Security Breach Litig.,* 2016 WL

6902351, at *6 (approving settlement of the consumer claims while a motion to dismiss was pending); *Smith v. Floor & Decor Outlets of Am., Inc.,* No. 1:15-CV-04316-ELR (N.D. Ga. Jan. 10, 2017) (approving settlement in a products liability class action before discovery opened).

Certainly, discovery might have filled in some gaps, potentially revealed some "smoking gun" documents, and allowed damages to be calculated with somewhat greater precision.  Yet, Class Counsel had a good idea what discovery was likely to show based on their discussions with knowledgeable insiders and Defendants' responses to the discovery that was done; already had sufficient information to prove the elements of their strongest claim (breach of contract), including Defendants' form contracts and the data showing what Defendants billed for the six class representatives and a representative sampling of  other class members; could estimate damages based on the work of their experts and the information produced during the settlement process; and had no need for discovery to appraise Defendants' major legal defenses such as the class action ban, which are not fact-dependent.

The argument that Class Counsel should not have settled without further discovery is also fatally flawed.  If the case had not settled when it did, Defendants intended to move immediately to enforce the class action ban in their form

contracts, and, in fact, shared their draft brief with Class Counsel during the last mediation session.  The price of turning down the proposed settlement in order to engage in additional discovery was that the Court might grant that motion, or others Defendants might file to enforce the restrictive provisions of their form contracts, effectively ending the case and leaving the class with nothing.  An objector upset with the amount of a settlement might be willing to pay that price without further analysis.  However, with $52 million in cash and an additional $20.5 million in other available benefits on the table, prudent lawyers acting in the best interests of the class would not do so, even if they discounted Defendants' prospects for an early knockout.  And, having done the risk/reward analysis here, Class Counsel reasonably decided to forego further discovery and settle.

### (2)   The Settlement Is Excellent, Considering the Range of Possible Outcomes.

Mr. Bowers and Lawrence Ashe, another experienced Atlanta litigator, each scrutinized the entire record, were aware of the results of the damages analyses done by GlassRatner and Class Counsel, and thoroughly understood the range of likely recoveries in light of the various risks.  Mr. Bowers concluded the settlement is a "major achievement for the class."  (Doc. 82-2, ¶ 8)  Mr. Ashe concluded the settlement is "excellent."   (Doc. 82-3, ¶ 18)

Nonetheless, each of the objectors asserted, with scant to nonexistent analysis, that the settlement amount is somehow inadequate. No objector discussed or even acknowledged the major factual and legal risks facing the class or the possibility that one potential outcome of continued litigation is a defense victory, rendering their arguments of little use in assessing whether the settlement amount is fair and reasonable. In any event, as addressed below, the different reasons they give for their assertions about the purported insufficiency of the settlement amount are unpersuasive and meritless.

Three objectors offered factual explanations for why they each believed the settlement to be inadequate. None of their explanations withstand scrutiny. According to Jason's Deli, the $52 million fund pales in comparison to the $1.6 billion Vantiv paid to buy Mercury in 2014. The comparison involves apples and oranges and is thus unhelpful. Mercury's sales price is of no value in determining the amount the class was overcharged. Advanced Nutrition Center claims it was eligible to recover through the settlement a small percentage of the $2,800 it was overcharged. Without an explanation of the particular fees that allegedly were improper or how the overcharges were calculated, the accuracy of the claim cannot be tested. Regardless, its usefulness in assessing the recovery of the class as a whole is questionable, particularly when a forensic accounting firm's professional

9

analysis shows that the class is recovering a much higher percentage. Finally, Mr. Webster contends an independent audit showed that his restaurant's recovery under the settlement is a tiny fraction of the overcharges that it paid. Yet, the alleged "audit" turned out to be nothing more than an estimate of potential savings if he renegotiated his Mercury contract. (Doc. 97 at 12-13) Potential savings under a new contract do not demonstrate that Mr. Webster was overcharged under his old contract, rendering his "audit" of no use here.

Leighasta and Mr. Webster each made an additional, but equally meritless, argument. They contended Class Counsel have not met their burden of showing the potential range of recoveries and, as a consequence, the Court purportedly cannot evaluate the settlement's overall fairness, thus precluding its approval on the current record. These two objectors contended Class Counsel's statement that the settlement recovers between 25 and 50 percent of the class-wide damages is insufficient, claiming Class Counsel should have provided the Court with such additional information as a report from their damages experts, the CVs of the experts, an explanation of what the experts did, and a description of the precise methodology used to estimate class-wide damages. Mr. Webster went so far as to say that without such information Class Counsel's damages estimates cannot satisfy *Daubert* standards.

By their argument, these objectors sought to impose an unjustifiable and unnecessary burden on Class Counsel and the Court, a burden that is unsupported by *any* of the authorities they cite, *none* of which require a court to consider such material as a condition of settlement approval.  The final approval process is not akin to a mini-trial where Class Counsel's assertions must be proved with evidence of the quality and specificity required for admissibility.  Judicial evaluation of a proposed settlement "involves a limited inquiry into whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of the settlement." *Ressler,* 822 F. Supp. at 1552-53.   A court's role is not to "engage in a claim-by-claim, dollar-by-dollar evaluation, but rather, to evaluate the proposed settlement in its totality." *Figueroa v. Sharper Image Co.*, 517 F. Supp. 2d 1292, 1326 (S.D. Fla. 2007).

Class Counsel's statement that the settlement recovers 25 to 50 percent of the overcharges – together with the general description in Plaintiffs' final approval motion about how their experts went about estimating damages – is sufficient for the Court to evaluate the range of possible recoveries, and to thus determine whether the settlement amount is adequate in light of all the risks facing the class.

Class Counsel and GlassRatner started their analysis with complete information for each of the class representatives, including their contracts, monthly

statements, and electronic data relating to all of the transactions that Mercury processed during the class period.  Recognizing that it would be impractical, unduly time-consuming, and defeat the purposes of settlement to analyze similar information for all 200,000 class members even if Mercury had the information readily available for each of them (which Mercury did not), GlassRatner obtained a list of all of Mercury's customers (by customer number) and randomly selected 100 current and 100 former customers for analysis.  Mercury then produced for each of those customers their contracts and the electronic data relating to all of the disputed charges.  Mercury also produced its total revenues from each of the disputed charges and other relevant information, such as the total number and dollar volume of all transactions processed during the class period.

Plaintiffs allege Mercury overcharged for three categories of fees, namely junk fees (*i.e.,* fees that were not authorized by contract), inflated access fees (*i.e.,* the amounts exceeding the fees published by Visa and MasterCard), and inflated interchange fees (*i.e.,* the amounts exceeding the published charges of the issuing banks involved in the transactions).  Using the above-described data, GlassRatner calculated the precise amount of overcharges paid by the class representatives for each of the three categories and, subject to certain limitations, the amount of junk fees and inflated access fees paid by each of the customers in the sample.

GlassRatner also calculated for the class as a whole the amount of junk fees paid to Mercury; estimated with reasonable confidence the amount of inflated access fees; and projected the amount of inflated interchange fees.[4]

Class Counsel presented GlassRatner's figures at the first mediation. However, based upon information from Mercury that was later confirmed, Class Counsel had to downwardly adjust the figures for the inflated access and interchange fees because the data upon which the figures were based included details of processing transactions for customers who did not have contracts requiring that the fees be passed through at cost.  Further, Class Counsel had to downwardly adjust the junk fee estimate to reflect that some of those fees were authorized by individual customers.

Taking these downward adjustments into account, Class Counsel's best estimate is that the overcharges total $184.5 million – $68.5 million for junk fees, $30 million for inflated access fees, and $86 million for inflated interchange fees.

---

[4]  The process of calculating inflated interchange fees was immensely time-consuming and complex because there are hundreds of different interchange fees (one for each different type of card and type of transaction) and electronic data was not available in a reasonably accessible form from Mercury to show what each customer actually paid for each of the fees, requiring GlassRatner to refer to the customers' monthly statements.  Simply to go through the analysis for the class representatives cost more than $60,000.  Thus, GlassRatner extrapolated the class-wide total of inflated interchange fees from the experience of the class representatives, a result that was reasonable for settlement purposes.

At the same time, Class Counsel realized that problems with Mercury's data might impede their ability to prove the inflated interchange fees at trial. While those problems probably could have been overcome, if not the inflated interchange fees would have to be excluded from the damages estimate, reducing the total recoverable overcharges to $98.5 million. The range of likely recovery, according to Class Counsel's analysis, thus was between $98.5 million and $184.5 million.

To reach a settlement, Class Counsel had to discount these figures considerably to account for the risks and expense of continued litigation. Valued at $52 million (and, to be conservative, ignoring the $20.5 million in added benefits provided by the available credit options), the settlement recovers between 28 percent of the high-end damage estimate and 53 percent of the estimate if the inflated interchange fees are excluded, consistent with what Class Counsel told the Court. Such a recovery is more than adequate. Indeed, in light of the real and substantial risks involved and the possibility that any of several adverse legal rulings would have left the class with nothing, Class Counsel would have been justified in settling for much less than Defendants to pay. *See, e.g., Behrens v. Wometco Enterprises. Inc.,* 118 F.R.D. 534, 542 (S.D. Fla. 1988), *aff'd,* 899 F.2d 21 (11th Cir. 1990) (because it must be evaluated considering the attendant risks, a "settlement can be satisfying even if it amounts to a hundredth or even a

thousandth of a single percent of the potential recovery").

### (3)   The Requested Attorneys' Fee Is Reasonable.

Class Counsel explained in their fee application why the requested fee is reasonable and should thus be approved.  The requested fee is also supported by well-reasoned declarations from Mr. Bowers, Mr. Ashe, and Hunter Hughes, the mediator who presided over the settlement negotiations.  The objectors, however, opposed the fee request, contending that the requested percentage is too high, Class Counsel should have produced their lodestar information, and the fee should be based on lodestar not a percentage of the class benefit.  The objections should be rejected.

The objectors' contentions about the requested fee percentage are not well taken.  The percentage requested by Class Counsel – 24 percent of the total benefit to the class – is well below the common fund fee typically awarded in the Eleventh Circuit, which as described in Class Counsel's fee application is roughly one-third of the benefit.[5]   Even if only the cash component of the settlement is considered, the requested fee is still right in line with other awards.  There is no good reason to

---

[5] A recent study, which has not yet been published, confirms what Class Counsel stated in their fee application.  The study examined all settlements between 2009 and 2013 and found that in the Eleventh Circuit the mean fee award was 30 percent and the median was 33 percent. *See* Ted Eisenberg, Geoff Miller & Roy Germano, Attorneys' Fees in Class Actions: 2009-2013, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2904194, p. 12.

award Class Counsel a lower than usual fee.  The settlement was an excellent one, deserving of a higher percentage, not a lower one.  Moreover, the objectors were simply wrong about the quality and the amount of work done by Class Counsel. This is not a case in which the lawyers did little work before reaching a settlement. During the more than three years they have been involved investigating and prosecuting the claims at issue, Class Counsel spent thousands of hours of benefit to the class.  (Doc. 82-4, ¶ 24)

Second, Mr. Webster and Leighasta argued that Class Counsel should be required to produce their lodestar and that the Court should scrutinize their billing records before awarding a fee.  This precise objection was rejected in *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1362 (S.D. Fla. 2011), where the court held that examining lodestar was unnecessary and inconsistent with applicable law.  As the court explained, the Eleventh Circuit in *Camden I* specifically rejected use of the lodestar method, but instead "mandate[d] the *exclusive* use of the percentage approach in common fund cases, reasoning that it more closely aligns the interests of client and attorney, and more faithfully adheres to market practice."  *Id.* at 1362-63 (emphasis in the original).  While some courts have used lodestar as cross-check, such a cross-check is not required and, indeed, was not done in *Camden I.*  Further, courts have cautioned about using lodestar as

a cross-check for fear of discouraging early settlements.  *In re Checking,* 830 F. Supp. 2d at 1362-63 ("The lodestar approach should not be imposed through the back door via a cross-check. Lodestar creates an incentive to keep litigation going in order to maximize the number of hours included in the court's lodestar calculation.") (internal citations omitted).

Finally, Mr. Webster is incorrect that the lodestar approach must be used to calculate Class Counsel's fee because the complaint seeks relief under RICO, a fee-shifting statute.  Setting aside the fact that Defendants have moved to dismiss the RICO claims, and that if the motion is granted no claim with a fee-shifting statute will remain, courts routinely award fees using the percentage method when a settlement creates a common fund, even when a RICO claim is in the case.  *See, e.g., In re Managed Care Litig.,* 2003 WL 22850070, at *6 (S.D. Fla. 2003) (awarding $50 million in fees and expenses using the percentage approach); *Klay v. Humana, Inc.*, 382 F. 3d 1241 (11th Cir. 2004) (demonstrating that RICO was the principle claim asserted in the litigation).  And the Eleventh Circuit has specifically noted that the existence of a claim under a fee-shifting statute does not require use of the lodestar approach in a common fund case. *Dikeman v. Progressive Express Ins. Co.,* 312 Fed. Appx. 168, 172 (11th Cir. 2008).

Similarly, contrary to Mr. Webster's assertion, in *Perdue v. Kenny A.,* 130 S. Ct. 1662 (2010), the Supreme Court did not abrogate the percentage-of-the-fund method for calculating fees. *Perdue* is limited to civil rights actions brought under 42 U.S.C. § 1983. *Camden I* remains the controlling authority in this Circuit for common fund cases, as evidenced by the fact that *Camden I,* not *Perdue,* is cited and relied upon by court after court in awarding fees to class counsel. And the specific argument based on *Perdue* made here by Mr. Isaacson – the professional objector who represents Mr. Webster – has been rejected in at least one other case in which he advanced it. *See In re BioScrip, Inc. Sec. Litig.,* No. 1:13-cv-06922-AJN (S.D. N.Y. July 26, 2017)(Doc. 134 at 6-19, 24)

## CONCLUSION

For the reasons set forth in this brief and in their prior filings, Plaintiffs and Class Counsel respectfully request that the Court finally approve the settlement and their request for fees, expenses, and service awards. A proposed order, which has been approved by Defendants, is attached as Exhibit 1 for the Court's consideration.

Dated:  August 28, 2017

*/s/ Kenneth S. Canfield*
Kenneth S. Canfield
 Georgia Bar No. 107744
Jonathan M. Palmer
 Georgia Bar No. 453452
DOFFERMYRE SHIELDS
  CANFIELD & KNOWLES LLC
1355 Peachtree Street, NE, Suite 1900
Atlanta, Georgia  30309
Telephone: 404-881-8900
kcanfield@dsckd.com
jpalmer@dsckd.com

*/s/ E. Adam Webb*
E. Adam Webb
 Georgia Bar No. 743910
Matthew C. Klase
 Georgia Bar No. 141903
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
Telephone: 770-444-0773
Adam@WebbLLC.com
Matt@WebbLLC.com

*/s/ Adam J. Levitt*
Adam J. Levitt
DICELLO LEVITT & CASEY LLC
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois  60602
Telephone:  312-214-7900
alevitt@dlcfirm.com

*/s/ David M. Buckner*
David M. Buckner
Seth Miles
BUCKNER + MILES
3350 Mary Street
Miami, Florida  33133
Telephone: 305-964-8003
david@bucknermiles.com
seth@bucknermiles.com

*Settlement Class Counsel*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, in compliance with Local Rule 5.1(c), that the foregoing motion and brief has been prepared using 14-point Times New Roman font.

*/s/ Kenneth S. Canfield*
Kenneth S. Canfield

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of August, 2017, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which automatically sends email notification of such filing to all attorneys of record.

/s/ Kenneth S. Canfield
Kenneth S. Canfield